

Opinions of the United
States Court of Appeals
for the Third Circuit

7-7-2004

# In Re: Global Tissue

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-2311

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation
"In Re: Global Tissue " (2004). *2004 Decisions.* Paper 520.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/520

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-2311
_____

IN RE:  GLOBAL TISSUE L.L.C.


ROBERT F. TROISIO, as Liquidating Trustee for
the Estate of Global Tissue L.L.C.,
Appellant

v.

E. B. EDDY FOREST PRODUCTS


U.S. TRUSTEE,
Trustee
_____

Appeal from the United States District Court
For the District of Delaware
C.A. No.: 02-1324
District Judge: Honorable Joseph Farnan
_____

Argued: April 22, 2004

Before: SCIRICA, <u>Chief</u> <u>Judge</u>, ROSENN and GREENBERG, <u>Circuit</u> <u>Judges.</u>

(Filed:  July 7, 2004 )

Denise S. Kraft (Argued)
Joanne B. Willis
Klehr, Harrison, Harvey, Branzburg & Ellers LLP
919 Market Street, Suite 1000
Wilmington, DE 19801-3062

*Counsel for Appellant*

Christopher P. Simon (Argued)
Thomas H. Kovach
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19899

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

ROSENN, Circuit Judge.

This case presents the second appeal from a decision of the Bankruptcy Court for the District of Delaware, raised by Robert Troisio ("Troisio" or the "Trustee"), the liquidating trustee for the estate of Global Tissue LLC ("Global Tissue"). Troisio argues that three payments made by Global Tissue to E.B. Eddy Forest Products Ltd. ("Eddy") and Domtar Industries, Inc. ("Domtar") (collectively "Creditors") during the ninety day period prior to filing a petition for bankruptcy should be avoided under 11 U.S.C. § 547(b) as preference payments. The Bankruptcy Court found that although the three payments met the threshold requirements for avoidance under section 547(b), the Creditors proved with sufficient evidence that the payments were entitled to the exception to avoidance under section 547(c)(2). Upon appeal, the District Court affirmed the Bankruptcy Court. Upon review of this appeal, we too will affirm.

2

I.

Global Tissue, which is engaged in the paper products industry, primarily produced paper goods from wood pulp. Of particular importance to this case, Global Tissue's largest account involved a product known as "SRM," produced under an exclusive contract with Kimberly Clark. In late April of 2000, Kimberly Clark informed Global Tissue that it was cancelling the SRM contract. The loss of this business, compounded by other financial constraints, threatened Global Tissue's economic well-being. In response, Global Tissue arranged for meetings on May 8, 2000 with Kimberly Clark in the hope of negotiating a contract extension that would allow Global Tissue time to find a replacement. During the intervening weeks in late April and early May 2000, Global Tissue maintained its production process so that it would be situated to continue the Kimberly Clark contract, should negotiations prove successful.

During this same time period, Global Tissue made three payments to the Creditors, who supplied the wood pulp that Global Tissue required to produce SRM. On April 18, 2000, Global Tissue paid Eddy $116,489.36, which covered three invoices that had been outstanding for 50 days. A second payment was made to Eddy on April 25, 2000 in the amount of $120,353.90, covering three invoices 47, 46 and 39 days old. The third payment was made to Domtar on May 8, 2000 in the amount of $262,933.75, covering five invoices that were 45, 41, 40, 38 and 26 days old.

The Bankruptcy Court acknowledged that during the normal course of their business relationship, both Domtar and Eddy placed credit limits on Global Tissue, establishing that new orders would not be shipped if the cost would exceed the credit limit. Thus, if Global Tissue approached its credit limit, it had to make ongoing payments to guarantee a continued supply of indispensable wood pulp.

The negotiations on May 8 with Kimberly Clark were unsuccessful. Because of the loss of this business, Global Tissue decided to terminate its operations immediately. It ceased operating on May 10, 2000, and filed its petition for bankruptcy under Chapter 11 on July 17, 2000.

## II.

The parties agree that the three payments made to the Creditors meet the initial requirements for avoidance under 11 U.S.C. § 547(b) because, among other things, they were made within 90 days of filing for bankruptcy while Global Tissue was insolvent. To meet the "ordinary course" exception to avoidance, the Creditors must prove three elements under 11 U.S.C. § 547(c)(2).[1] The Trustee concedes that element (A) under

---

[1] 11 U.S.C. § 547(c)(2) provides in pertinent part:
"The trustee may not avoid under this section a transfer – to the extent that such transfer was –
    (A) in payment of a debt incurred by the debtor in the ordinary course of business ... of the debtor and the transferee;
    (B) made in the ordinary course of business ... of the debtor and the transferee; and
    (C) made according to ordinary business terms."

section 547(c)(2) has been met, because Global Tissue incurred the debt to the Creditors in the ordinary course of business. However, the Trustee disputes whether the Creditors have proven that under section 547(c)(2)(B), the payment was made in the ordinary course of business between the parties, and under section 547(c)(2)(C), the payment was made according to ordinary business terms in the industry.

The Bankruptcy Court found that the Creditors had proven all three elements of the ordinary course exception under 11 U.S.C. § 547(c)(2). This determination is a finding of fact, which we review under a clearly erroneous standard. J.P. Fyfe, Inc. of Fla. v. Bradco Supply Corp., 891 F.2d 66, 70 (3d Cir. 1989) (citation omitted). Thus, we must uphold the Bankruptcy Court's determination unless we find that it is devoid of evidentiary support or bears no rational relationship to the evidence in the record. DiFederico v. Rolm Co., 201 F.3d 200, 208 (3d Cir. 2000). To the extent that Troisio challenges the Bankruptcy Court's conclusions of law, we review those matters *de novo*. Am. Flint Glass Workers Union v. Anchor Resolutions Corp., 197 F.3d 76, 80 (3d Cir. 1999). Because the District Court sat as an appellate court in this case, we review its decision *de novo*. In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 122 (3d Cir. 1999).

The Bankruptcy Court maintained jurisdiction for this suit under 28 U.S.C. § 157(b). The District Court obtained appellate jurisdiction under 28 U.S.C. § 158(a), and we have appellate jurisdiction under 28 U.S.C. §§ 158(d) and 1291.

A.

5

This court has recognized that section 547 of the Bankruptcy Code regarding avoidance of preference payments serves two purposes.

> On the one hand the preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor. On the other hand, the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy.

In re Molded Acoustical Prods., Inc., 18 F.3d 217, 219 (3d Cir. 1994). Thus, the court's general inquiry in these preference cases is to determine whether the payments to a creditor made in the 90 days preceding a filing for bankruptcy were in response to a zealous creditor's attempt to collect on a debt through preferential treatment ahead of other creditors, or an attempt by the debtor to maintain normal business practices in hope of staving off bankruptcy.

The Trustee argues that the three payments tendered to the Creditors in this case were accelerated from the "ordinary course" of dealing between these parties, and thus did not meet the requirements of section 547(c)(2)(B). The Trustee submitted records of all payments made by Global Tissue to the Creditors over their 16 to 17 month business relationships. The average payment to Eddy was made 51.5 days after invoice, with a range of 32-98 days. Payments to Domtar averaged 59.6 days after invoice, with a range of 18-98 days. Thus, the Trustee argues that the payments in question, ranging from 26-

50 days after invoice, were made significantly faster (3% - 56% faster) than the ordinary payments. The Trustee also argues that the Creditors applied pressure on Global Tissue to make the payments, as reflected by phone calls from the Creditors requesting payment. In response, it is argued, one of the payments was sent by overnight courier.

The Trustee's reliance on the average payment time, as is often the case with statistics, does not portray the complete picture of Global Tissue's payment history. During the first two months of Global Tissue's relationship with the Creditors, all of its payments were extremely late, often 80 - 98 days after invoice. Those late payments, concentrated primarily in the beginning of the relationship, skewed the average payment time upwards. After two months of significant delinquency, Global Tissue began making payments on a much more timely basis, establishing a history of more prompt payments continuing for the next year.

The record shows that Global Tissue rarely paid its invoices within thirty days. After the first months of severe delinquency, however, the Bankruptcy Court found that the payments thereafter were made typically in the 30 to 50 day range. Thus, the payments in question, made 26 to 50 days after invoice, fall within this same range. Furthermore, the Bankruptcy Court found that the Creditors had placed credit limits on Global Tissue in the past. These credit limits reasonably explain calls from the Creditors and prompt overnight payments to ensure that new shipments of wood pulp were not delayed. In light of the evidence supporting these findings, we believe that the

7

Bankruptcy Court's conclusion that the payments in question were made within the ordinary course of business established between these parties was not clearly erroneous. Therefore, we uphold the District Court's affirmance on this issue.

B.

In challenging the Bankruptcy Court's finding that the payments to the Creditors were made within the ordinary business terms established in the industry, the Trustee argues that the Creditors failed to produce proper evidence of industry standards. At trial, the Creditors provided testimony from their credit managers, Msrs. Gohier and Bennett, regarding payment practices in the paper industry. Both witnesses had been working in the paper industry for over 10 years, and had managed credit accounts for hundreds of customers. They testified that while all account payments for all customers were expected in net-30 days, the actual payments were often made after 30 days. Specifically, the Bankruptcy Court acknowledged the credit managers' explanation that in the pulp industry, it was common for "small mills," such as Global Tissue, to run beyond the 30 day payment term.

In Molded Acoustical, this court noted that information about competitors' trade practices used to establish industry standards may be difficult to obtain, particularly if antitrust concerns prevent the sharing of payment information among firms in a particular industry. 18 F.3d at 224. Thus, courts must allow some flexibility regarding sources of evidence used to establish the range of practices that will be deemed the industry standard

8

in the section 547(c)(2)(C) analysis. The Bankruptcy Court for the District of Delaware faced this same evidentiary situation in In re Cherrydale Farms, Inc.. There, the Bankruptcy Court deemed testimony from one particular employee, who had been working in the industry for many years, sufficient to establish evidence of an industry standard. 2001 WL 1820323 at *5 (Bankr. D. Del) ("[Creditor] submitted an affidavit from Cherrydale's CFO with many years of experience with Cherrydale and within the industry. I cannot think of a better witness."). Contrary to the Trustee's arguments, we believe that the decision in Cherrydale supports the notion that testimony from employees of the parties involved in a preference payment dispute may be used to establish an industry standard, as long as the court determines that the employees are credible and have significant and relevant industry experience. This position is consistent with the holding in Molded Acoustical.

In the case at bar, the Creditors provided testimony from employees with extensive experience in the paper industry. The witnesses explained that the payments submitted by Global Tissue were typical of small mills in the paper business. The Bankruptcy Court accepted this testimony as valid proof that the payments were made in accordance with industry standards under 11 U.S.C. § 547(c)(2)(C). We hold that the

Bankruptcy Court's determination in this matter was supported by sufficient evidence.[2]

The District Court opinion on this issue, upholding the Bankruptcy Court, is affirmed.

III.

Accordingly, the judgment of the District Court is affirmed. Costs taxed against the Appellant.

---

[2] The Trustee also disputes whether the Creditors in this case are entitled to any flexibility in their compliance with industry standards due to the duration of their pre-preference relationship, as established in Molded Acoustical, 18 F.3d at 225. Although we see no reason to doubt the Bankruptcy Court's analysis on this topic, we do not find it necessary to address the issue because the evidence supports a finding that Global Tissue's payments were made according to industry standards, even without the additional deference afforded to a longer pre-preference relationship.