**In re J. ALLAN STEEL COMPANY, Debtor.**

**Official Committee of Unsecured Creditors of J. Allan Steel Company, Plaintiff,**

**v.**

**Nucor–Yamato Steel Company, Defendant.**

**Bankruptcy No. 03–23846–BM. Adversary No. 04–2014–BM.**

United States Bankruptcy Court, W.D. Pennsylvania.

April 8, 2005.

Michael Kaminski, Esq., for Plaintiff.

Scott M. Tyler, Esq., for Defendant.

### MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

The Official Committee of Unsecured Creditors of debtor J. Allen Steel Company has brought this adversary action against Nucor–Yamato Steel Company. It seeks in accordance with §§ 547(b) and 550(a)(1) of the Bankruptcy Code to avoid and recover allegedly preferential transfers debtor made to Nucor–Yamato during the 90–day preference period prior to debtor's bankruptcy filing.

Nucor–Yamato maintains that the Committee lacks standing to bring and prosecute this avoidance action. It further asserts that even if the transfers at issue were preferences, they cannot be avoided in light of the ordinary-course exception to avoidance of preferences found at § 547(c)(2) of the Bankruptcy Code.

Judgment in the amount of $837,061.96 will be entered in favor of the Committee and against Nucor–Yamato for reasons set forth in this memorandum opinion.

### - FACTS -

The fundamental facts of this case are straightforward and relatively uncomplicated.

Debtor is a processor and distributor of various steel products. It does not manufacture steel.

Nucor–Yamato is in the business of manufacturing steel products.

Debtor was a customer of Nucor–Yamato. Their business relationship began in April of 1989 and terminated shortly before debtor filed its bankruptcy petition. Nucor–Yamato last shipped steel to debtor in mid-February of 2003.

There was no written agreement between debtor and Nucor–Yamato concerning payment terms. However, each invoice Nucor–Yamato issued for steel it shipped to debtor stated that the payment term was "Net Thirty Days", with a discount of one-half percent of the amount due if paid in full within ten days of the invoice date.

Throughout the course of their business relationship, debtor paid for steel it received from Nucor–Yamato by check drawn on its account. 1At no time did Nucor–Yamato require debtor to pay in advance or on a C.O.D. basis.

During the preference period, debtor issued a series of checks payable to Nucor–Yamato in various amounts for steel Nucor–Yamato had previously shipped to debtor.

On January 6, 2003, debtor issued a check in the amount of $199,666.34 payable to Nucor–Yamato.

On January 10, 2003, debtor issued a check in the amount of $48,325.34 payable to Nucor–Yamato.

On January 24, 2003, debtor issued a check in the amount of $300,172.44 payable to Nucor–Yamato.

On January 28, 2003, debtor issued a check in the amount of $15,941.97 payable to Nucor–Yamato.

On February 7, 2003, debtor issued a check in the amount of $205,421.99 payable to Nucor–Yamato.

On February 10, 2003, debtor issued a check in the amount of $43,758.13 payable to Nucor–Yamato.

On February 13, 2003, debtor issued a check in the amount of $251,282.03 payable to Nucor–Yamato.

Nucor–Yamato deposited each of these checks into its account prior to March 28,

2003, when debtor filed a voluntary chapter 11 petition.

The schedules accompanying debtor's bankruptcy petition listed assets with a total declared value in the amount of $22,922,688 and liabilities totaling $26,688,047. Of this latter amount, Nucor–Yamato was listed by debtor as having a general unsecured claim in the amount of $1,328,946.83. The claim was not listed as disputed.

Due to the considerable amount of unsecured debt listed, a committee of unsecured creditors was appointed by the United States trustee on April 11, 2003. Nucor–Yamato initially sat on the Committee but withdrew when it became apparent that this adversary action against it was imminent.

In Article 4.6 of debtor's proposed plan of reorganization, which was confirmed on September 25, 2004, debtor assigned its right to bring avoidance actions to the Official Committee Of Unsecured Creditors Of J. Allan Steel Company ("Committee"). Article 7.2 of the plan vested the Committee with exclusive authority and discretion to bring and prosecute any avoidance actions it deemed appropriate.

Any recovery attained in such actions ultimately was to accrue to the benefit of the class of creditors having allowed general unsecured claims. Any such avoidance actions were to remain the property of the bankruptcy estate after the confirmation date.

Exercising this authority, the Committee initiated this adversary action against Nucor–Yamato on January 6, 2004. It asserted in the complaint that the above payments to Nucor–Yamato constituted preferences for purposes of § 547(b) and sought to recover them in accordance with § 550(a)(1).

Nucor–Yamato asserted in its answer to the Complaint that the Committee lacked standing to bring and prosecute this adversary action, notwithstanding the provisions of debtor's confirmed plan of reorganization. It alternatively asserted that the above payments were not avoidable because they fell within the scope of the ordinary-course exception found at § 547(c)(2) or the new-value exception found at § 547(c)(4) of the Bankruptcy Code.

Partial summary judgment in favor Nucor–Yamato was entered with respect to certain of the above payments totaling $187,061.39 when the Committee conceded at oral argument on Nucor–Yamato's motion for summary judgment that the new-value exception applied to payments made in that amount. Its motion for summary judgment was denied with respect to the remaining $837,061.96 in payments. Said payments in this latter amount remain at issue in this adversary action.

The action was tried on November 10, 2004, at which time Nucor–Yamato and the Committee were given an opportunity to offer evidence on the issues remaining. The matter is now ready for disposition.

## - DISCUSSION -

### Does The Committee Lack Standing To Bring and Prosecute This Matter?

The Committee seeks to avoid the above payments to Nucor–Yamato in accordance with § 547(b) of the Bankruptcy Code, which provides as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property -

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made -

(A) on or within 90 days before the date of the filing of the petition; . . . .

(5) that enables such creditor to receive more than such creditor would receive if -

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title

11 U.S.C. § 547(b).

Section 547(b) expressly states that "the trustee may" avoid any transfer of an interest of the debtor in property that satisfies the requirements enumerated therein.

■ Nucor–Yamato contends that the Committee lacks standing to bring this preference action. According to Nucor–Yamato, the phrase "the trustee may" permits only a trustee or, pursuant to § 1107(a) of the Bankruptcy Code, a debtor-in-possession in a chapter 11 case to bring such an avoidance action. No other party in interest—e.g., the Committee—may, Nucor–Yamato asserts, bring a preference avoidance action.

As authority for this proposition, Nucor–Yamato points to the holding of the United States Supreme Court in *Hartford Underwriters Insurance Co. v. Planters Bank, N.A.*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000), which construed the phrase "the trustee may" as precluding anyone other than a trustee in a chapter 7 case from seeking to recover costs and expenses from a secured creditor whose collateral the other party had preserved.

Section 506(c) of the Bankruptcy Code provides that:

[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c).

After examining the plain language of the phrase "the trustee may" appearing in § 506(c), the Supreme Court determined "it appears quite plain" that *only* the trustee in a chapter 7 case may recover administrative costs and expenses ahead of allowed secured claims. 530 U.S. at 6, 120 S.Ct. at 1947. While acknowledging that § 506(c) does not expressly exclude parties other than a chapter 7 trustee, the Supreme Court had "little difficulty" concluding that a trustee in a chapter 7 case is the only person empowered to utilize § 506(c). Reading § 506(c) to extend only to the trustee, it concluded, was "by far the most natural reading". 530 U.S. at 9, 120 S.Ct. at 1950.

As does § 506(c), § 547(b) contains the phrase "the trustee may". Nucor–Yamato would have us conclude in light of the Supreme Court's interpretation of the phrase in § 506(c) that only a trustee or a debtor-in-possession who "stands in the shoes" of a trustee has standing to bring an avoidance in accordance with § 547(b). A creditors' committee, in other words, does not have standing to do so.

It should be noted that the Supreme Court expressly avoided concluding that its gloss of the phrase "the trustee may" found at § 506(c) applies with equal force to the same phrase found in § 547(b) and in other avoidance provisions in the Bankruptcy Code. *Hartford Underwriters,* 530 U.S. at 13 n. 5, 120 S.Ct. at 1951 n. 5. If it expects to prevail on this basis, Nucor–Yamato must do more than cite to *Hartford Underwriters* in the talismanic and mechanical fashion that it does.

Even if we set this difficulty aside, Nucor–Yamato's assertion that the holding of *Hartford Underwriters* applies with equal force to § 547(b) and that the Committee therefore has no standing to bring this preference avoidance action lacks merit. To the contrary, we conclude that the Committee has such standing.

This adversary action is distinguishable from *Hartford Underwriters* in various critical respects.

*Hartford Underwriters* started out as a chapter 11 case but eventually was converted to a chapter 7 case when the debtor therein ultimately failed to reorganize. 530 U.S. at 4, 120 S.Ct. at 1946. Debtor in the present case remained in possession throughout its bankruptcy case and succeeded in having its chapter 11 plan confirmed.

No chapter 11 trustee was appointed in this case. As debtor-in-possession, J. Allen Steel unquestionably had standing in light of § 1107(a) of the Bankruptcy Code to bring this adversary action if it elected to do so. Notwithstanding the gloss given in *Hartford Underwriters* to the phrase "the trustee may" as it appears in § 506(c), the same phrase in § 547(b) does not preclude every party-in-interest other than a trustee from bringing a preference action *in a chapter 11 case*. A debtor-in-possession obviously may do so.

The present case is distinguishable from *Hartford Underwriters* in another critical respect.

The petitioner in *Hartford Underwriters* was an insurer with an administrative claim for providing debtor with post-petition insurance for which debtor ultimately did not pay. Upon learning that the debtor was insolvent, the petitioner acted in a "strikingly unilateral fashion" to recover the premiums. The premiums, if recovered, would have satisfied only the claim of the petitioner. Moreover, the petitioner sought permission to recover the expense from neither the bankruptcy court nor the trustee. *The Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548 (3d Cir.) (2003), *cert. dismissed*, 540 U.S. 1002, 124 S.Ct. 530, 157 L.Ed.2d 407 (2003).

In this case, by contrast, the Committee did not act unilaterally. Debtor's confirmed plan of reorganization *assigned* to the Committee the right to bring and to prosecute avoidance actions for the benefit of general unsecured creditors having allowed claims. In the event such actions were brought, they were to remain property of the bankruptcy estate from and after the date of plan confirmation.

Debtor, in other words, authorized the Committee to act as its surrogate in deciding whether to bring and to prosecute avoidance actions. As a consequence, the principle that only a trustee or a debtor-in-possession may bring an avoidance action in accordance with § 547(b) is not violated here. It is not significant in our estimation that the Committee brought this avoidance action in its own name rather than in debtor's name.

Not only did debtor consent to having the Committee bring avoidance actions, this court in effect authorized the Committee to do so by confirming debtor's plan of reorganization.

An order confirming a chapter 11 plan is binding on the debtor as well as a creditor without regard to whether that creditor voted for or against the plan. 11 U.S.C. § 1141(a). A confirmation order is *res judicata* as to all issues that could have been decided at the confirmation hearing. *Donaldson v. Bernstein*, 104 F.3d 547, 554 (3d Cir.1997). A creditor who fails to timely object to the plan may not later

complain about some provision in the plan, even if the provision is inconsistent with the Bankruptcy Code. *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir.1995).

■ Not only was Nucor–Yamato a creditor in this case, it once was a member of the Committee and had ample opportunity at the confirmation hearing to object to the provision of debtor's plan delegating the power to bring avoidance actions to the Committee. It unquestionably was aware of this provision and will not be heard to complain about it now.

One might argue that by assigning its right to bring avoidance actions to the Committee, debtor can be said to have refused to do so and instead left it to the Committee to do so if it so elected. While we reject the notion that debtor refused to bring this adversary action, this would be of no consequence even if this "spin" were accurate.

Several decisions since *Hartford Underwriters* have concluded that the construal by the Supreme Court of the phrase "the trustee may" in § 506(c) does not necessarily preclude a creditors' committee from initiating and pursuing an action where the same phrase appears in other provisions of the Bankruptcy Code. Of particular relevance in this instance is *In re Cybergenics, supra*.

That case concerned § 544(b)(1) of the Bankruptcy Code, which provides as follows:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

As do § 506(c) and § 547(b), § 544(b)(1) contains the troublesome phrase "the trus-tee may". The question addressed in *In re Cybergenics* was whether the Supreme Court's gloss of the phrase "the trustee may" arrived at in *Hartford Underwriters* operated to prevent a bankruptcy court from authorizing a suit initiated by a creditors' committee brought pursuant to § 544(b)(1). 330 F.3d at 553. The creditors' committee had received authorization from the bankruptcy court to proceed in accordance with § 544(b)(1) after the debtor-in-possession was deemed to have unreasonably refused to prosecute an action. 330 F.3d at 554.

The majority in *In re Cybergenics* acknowledged that the phrase "the trustee may" appearing in § 544(b)(1) cannot be construed to mean "the trustee *and other parties in interest may*". It instead concluded that the statutory scheme of the Bankruptcy Code does not preclude the bankruptcy court from employing its equitable powers to authorize a creditors' committee to bring an avoidance action when the trustee (or debtor-in-possession) improperly refuses to exercise that power. 330 F.3d at 559.

The *Cybergenics* court concluded after considerable deliberation that a bankruptcy court's ability to confer such standing on a creditors' committee under such circumstances is a "straightforward" application of its equitable powers. 330 F.3d at 568. Its express language notwithstanding, § 544(b)(1) does not preclude a bankruptcy court from using its equitable powers to substitute itself as "gatekeeper" when the trustee (or debtor-in-possession) is "delinquent" in unreasonably refusing to bring and pursue an avoidance. The bankruptcy court, as substitute gatekeeper, may authorize a creditors' committee to do so on behalf of the bankruptcy estate. 330 F.3d at 568–69.

If it is assumed that debtor in this case unreasonably refused to bring and to prosecute this avoidance action, we conclude for reasons similar to those articulated in *In re Cybergenics* that we nonetheless had equitable power to authorize the Committee to do so. We exercised this equitable power by confirming debtor's plan of reorganization.

### Were The Payments Preferences?

The Committee in this case has the burden of proving that a transfer is avoidable as a preference in accordance with § 547(b) of the Bankruptcy Code. 11 U.S.C. § 547(g). It must do so by a preponderance of the evidence. *Bober-schmidt v. Society National Bank (In re Jones)*, 226 F.3d 917, 921 (7th Cir.2000).

The parties have stipulated that §§ 547(b)(1), (2), (4), and (5) are satisfied with respect to the payments at issue here.

Nucor–Yamato has not, however, stipulated that § 547(b)(3)—i.e., that debtor was insolvent when the payments were made—also is satisfied. It half-heartedly denied at trial that § 547(b)(3) is satisfied. Nucor–Yamato instead merely conceded that, as a matter of law, debtor presumably was insolvent during the 90–day period preceding the bankruptcy filing. See 11 U.S.C. § 547(f).

This provision gives rise to a rebuttable presumption that debtor was insolvent during that period. *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, 221 n. 4 (3d Cir.1994). The presumption imposes upon Nucor–Yamato the burden of coming forward with evidence to rebut it. The ultimate burden of proving that debtor was insolvent, however, remains with the Committee in this instance. *Official Committee of Unsecured Creditors of R.M.L., Inc. v. Concercia Sabrina,*

*S.P.A. (In re R.M.L., Inc.)*, 195 B.R. 602, 611 (Bankr.M.D.Pa.1996).

Nucor–Yamato offered no credible evidence at trial to rebut the presumption that debtor was insolvent when it made the above payments to Nucor–Yamato. Testimony by Nucor–Yamato's credit manager that it first learned of debtor's insolvency when debtor filed its bankruptcy petition does not suffice to rebut the presumption and is consistent with the proposition that debtor was insolvent when the payments at issue were made to Nucor–Yamato during the preference period.

### Does The Ordinary–Course Exception At § 547(c)(2) Apply?

Because they are preferences, the Committee may set aside and recover the above preference payments to Nucor–Yamato for the benefit of the bankruptcy estate *unless* they "fall within one of the statutory safe harbors for otherwise preferential transfers". *In the Matter of J.P. Fyfe, Inc. Of Florida v. Bradco Supply Corp.*, 891 F.2d 66, 69 (3d Cir.1989). The initial clause of § 547(b) specifies that the trustee may avoid a preferential transfer "except as provided in subsection (c)" of § 547.

Nucor–Yamato asserts as an affirmative defense that the above payments still at issue lie within the "safe harbor" found at § 547(c)(2) of the Bankruptcy Code, which provides as follows:

(c) the trustee may not avoid under this section a transfer — . . . .

(2) to the extent that such transfer was —

(A) in payment of a debt incurred by the debtor in the ordinary course of business . . . of the debtor and the transferee;

(B) made in the ordinary course of business ... of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

■ Subparts (A), (B) and (C) are conjunctive, not disjunctive. *Matter of Fyfe,* 891 F.2d at 69. Because Nucor–Yamato seeks refuge in this "safe harbor", it must prove by a preponderance of the evidence that each conjunct is satisfied in this instance. *U.S. Trustee v. First Jersey Securities (In re First Jersey Securities),* 180 F.3d 504, 512 (3d Cir.1999).

Nucor–Yamato and the Committee have stipulated that § 547(c)(2)(A) is satisfied here. The debts in question were incurred "in the ordinary course of business" of debtor and Nucor–Yamato. Debtor routinely purchased steel products from Nucor–Yamato which debtor then processed for its own customers.

The Committee denies, however, that §§ 547(c)(2)(B) and 547(c)(2)(C) are satisfied. The payments at issue, it asserts, were neither made by debtor "in the ordinary course of business" of debtor and Nucor–Yamato nor were made "according to ordinary business terms".

**(I) § 547(c)(2)(B): Were The Payments Made In The Ordinary Course Of Business Of Debtor And Nucor–Yamato?**

The preference period in this case began on December 28, 2002, ninety days before debtor filed its voluntary chapter 11 petition on March 28, 2003.

The Committee and Nucor–Yamato have stipulated that the average interval between the date on which Nucor–Yamato issued an invoice and its payment by debtor during the two-year period immediately preceding the bankruptcy filing—i.e., from January of 2001 through December of 2002—was 50.6 days; that the standard deviation was 14.7 days; and that the range of days until payment was made was 18 to 137 days.

They have further stipulated that the average interval between the date on which Nucor–Yamato issued an invoice and its payment by debtor during the preference period was 66.7 days; that the standard deviation was 9.4 days; and that the range of days until payment was made was 46 to 85 days.

■ What qualifies as "ordinary" for purposes of § 547(c)(2) is not defined anywhere in the Bankruptcy Code. *Matter of Fyfe* teaches that the standard for determining what is "in the ordinary course of business" in this context is subjective. A court, in other words, must determine whether a contested transfer was ordinary *as between the debtor and the creditor.* Factors such as the timing, the amount and the manner of payment may be significant in this regard. *First Jersey Securities,* 180 F.3d at 512.

■ The business relationship of debtor and Nucor–Yamato lasted some fourteen years. In attempting to establish what was "ordinary" as between them for purposes of § 547(c)(2)(B), however, Nucor–Yamato produced records of its dealings with debtor that went back only two years and three months prior to the filing of debtor's chapter 11 petition. With one exception, the initial twelve years or so of their relationship is a veritable "black hole".

Nucor–Yamato's credit manager, who nonetheless testified at length from memory concerning much of those twelve years, explained that Nucor–Yamato had "purged" its computers a few years ago. She assured the court that Nucor–Yamato had provided all of the data that was available. As might be expected, she testified from memory that those missing twelve

years were not unlike the final two years and three months of the business relationship of debtor and Nucor–Yamato.

To say the least, it is curious that Nucor–Yamato retained no hard copy of these earlier transactions. Had the records for these twelve years been provided, we undoubtedly would have a clearer picture than we presently have of the nature of their business relationship throughout its existence. We would perhaps be able to say what was "ordinary" for purposes of § 547(c)(2)(B).

The nagging question remains whether the initial twelve years of their relationship was in truth similar to the final two years and three months and, accordingly, that what was ordinary between debtor and Nucor–Yamato throughout their relationship for purposes of § 547(c)(2)(B) is accurately reflected by the records concerning the final two years and three months. Nucor–Yamato failed to allay our concerns about this issue.

The reminiscences of Nucor–Yamato's credit manager concerning the missing twelve years are not persuasive. Nucor–Yamato had numerous customers aside from debtor with whom it did considerable business. We think it unlikely that she could testify in detail from memory alone concerning the specifics of debtor's dealings with Nucor–Yamato during those twelve years.

Moreover, the one item of documentary evidence, a credit report, pertaining to the missing twelve years indicated that the average interval between invoice dates and debtor's payment of the invoices during one quarter of the year 2000 was thirty-four days. This contrasts starkly with evidence showing that the average interval was 50.6 days during the two-year pre-preference period and was 66.7 days during the preference period.

Nucor–Yamato, which has the burden of proving that payments debtor made to it during the preference period were in the ordinary course of their business relationship for purposes of § 547(c)(2)(B), has not so proved by a preponderance of the evidence. The evidence Nucor–Yamato offered in this regard contains too many gaps and leaves critical questions unanswered.

The outcome of this adversary action is not based solely on this conclusion, however. As we shall see, Nucor–Yamato also failed to meet its burden of proof with respect to § 547(c)(2)(C) of the Bankruptcy Code.

### (II) § 547(c)(2)(C): Were The Payments Made According To Ordinary Business Terms?

It remains to be determined whether the payments totaling $837,061.96 debtor made to Nucor–Yamato during the preference period were made according to ordinary business terms for purposes of § 547(c)(2)(C). Because this requirement must be satisfied separately from § 547(c)(2)(B), when making this determination we must go beyond ascertaining what was ordinary *vis-à-vis* debtor and Nucor–Yamato. *In re Molded Acoustical Products,* 18 F.3d at 223–24.

The phrase "according to ordinary business terms" in § 547(c)(2)(C) refers to the broad range of terms found in businesses similar in some general way to the creditor. Only practices that are so unusual as to fall outside that broad range are deemed to be extraordinary and to fall outside the scope of § 547(c)(2)(C). *Molded Acoustical Products,* 18 F.3d at 224. Except for one modification, the Third Circuit adopted the standard formulated by the Seventh Circuit in *In re Tolona Pizza Products Corp.,* 3 F.3d 1029, 1033 (7th Cir.1993). The only difference is the sub-

stitution of the word "unusual" for the word "idiosyncratic". 18 F.3d at 224.

The Third Circuit "embellished" the standard set forth in *Tolona Pizza Products* with the additional proposition that § 547(c)(2)(C) "countenances a greater departure" from that broad range of terms in the industry the longer the pre-insolvency relationship between the debtor and the creditor was "solidified". *Molded Acoustical Products,* 18 F.3d at 220.

■ Although the creditor is required to produce evidence of an industry standard, § 547(c)(2)(C) is "quite accommodating" in this regard. The industry need only be "similar in some general way" to the creditor in question. 18 F.3d at 224.

■ The above standard does not provide a "bright line approach" for ascertaining if the business practices of the creditor conform to those of an industry. 18 F.3d at 224.

■ Finally, the duration of the business relationship of a debtor and a creditor is "logically pertinent" to determining the extent to which a creditor may depart from the broad range of credit terms extant in the industry while still remaining within the confines of § 547(c)(2)(C). The more "cemented" (as measured by its duration) the pre-insolvency business relationship of the parties, the more the creditor may vary its credit terms from the range of terms prevailing in the industry without going beyond the scope of § 547(c)(2)(C). The likelihood of "unfair overreaching" by the creditor decreases as the duration of their pre-insolvency relationship increases. 18 F.3d at 224–25.

■ Conversely, if the relationship between the debtor and the creditor is of recent origin or began only shortly before or after debtor "sailed into financially troubled seas", the credit terms will have to "endure a rigorous comparison" to the range of credit terms prevailing in the industry. There is no "baseline" in such event for confirming that debtor and creditor would have operated under the same terms had debtor's bankruptcy loomed. 18 F.3d at 225–26.

■ In sum, § 547(c)(2)(C) requires a creditor to prove that the debtor's preferential transfer was made "in harmony" with the range of terms prevailing in some relevant industry. Moreover, the creditor will be able to depart substantially from that range and still find "safe haven" when it and debtor have had an enduring and steady relationship, one whose terms have not changed significantly during the preference period. 18 F.3d at 226.

■ However, the extent to which credit terms may vary from the industry norm when debtor established a business relationship well before debtor's insolvency is not unbounded. If the operative credit terms between the debtor and the creditor "depart grossly" from the industry norm, a preferential transfer is deemed to be "unusual" and hence outside the scope of § 547(c)(2)(C). 18 F.3d at 226. How much of a departure from the range of industry terms is allowed before it considered as "depart[ing] grossly" is undefined and must be determined on a case-by-case basis.

In addition to articulating a standard for determining whether a particular transfer was made "in the ordinary course of business" in accordance with § 547(c)(2)(C), the Third Circuit has formulated a three-step procedure for its application.

■ We first must determine the broad range of terms on which businesses similar in some general way to the creditor provided credit to businesses comparable to the debtor on some level. 18 F.3d at 226. Next we must scrutinize the length

of the business relationship of the creditor and debtor. Preceding the debtor's insolvency to estimate "the size of the customized window" surrounding the range that was established is the first step. Finally, we must determine whether their business relationship "remained relatively stable" leading into and through the insolvency period. 18 F.3d at 227.

Nucor–Yamato's expert testified that, in his professional opinion, the industry norm was for steel producers like Nucor–Yamato to be paid an average at least fifty days from the invoice date. He further testified that payments to such steel producers ranged up to fifteen days beyond the fifty-day average. In his estimation, payments made up to sixty-five days after the invoice date were made according to ordinary business terms for purposes of § 547(c)(2)(C).

Debtor and Nucor–Yamato have stipulated that the average interval between the invoice date and its payment during the preference period in this case was 66.7 days. Considering the fourteen-year duration of their business relationship, Nucor–Yamato would have us conclude that all payments debtor made to it during the preference period were "ordinary" for purposes of § 547(c)(2)(C).

The Committee countered the testimony of Nucor–Yamato's expert with two expert witnesses of its own.

One witness testified that all three steel producers upon which Nucor–Yamato's expert relied in his analysis wound up in bankruptcy themselves and therefore were of questionable utility for determining the average interval in the industry. In addition, relying upon publicly-available dossiers for eight steel producers similar to Nucor–Yamato, he testified that the average interval for these steel producers was thirty to forty-five days.

The Committee's other witness, also an expert, testified that in his estimation the conclusions of Nucor–Yamato's expert were speculative, at best, and were baseless.

■ All three of the witnesses were highly qualified and articulate. They were not, however, neutral and completely objective, as each of them had an interest in one way or another on the outcome of this case. After reviewing their testimony at great length, however, we conclude for reasons set forth below that Nucor–Yamato's expert was not persuasive in critical respects and, consequently, further conclude that Nucor–Yamato has not met its burden of proving that § 547(c)(2)(C) applies to this case.

The opinion of Nucor–Yamato's expert that payments debtor made to Nucor–Yamato during the preference period up to sixty-five days from the invoice date were consistent with ordinary business terms in accordance with § 547(c)(2)(C) was based on two propositions: (1) that payments within the industry during the years 2001 and 2002 were made on average at least fifty days from the invoice date; and (2) that payments in the industry were commonly made in the range of up to fifteen days beyond this average.

The testimony of Nucor–Yamato's expert was not persuasive. There are serious flaws in the analysis he employed in arriving at these propositions.

Nucor–Yamato's expert first considered reports filed with the Securities and Exchange Commission ("SEC") by seven steel processors purportedly similar to debtor. After making a ten percent upward adjustment in the average number of reported days that had elapsed from the invoice date to the date of its payment, Nucor–Yamato's expert asserted that the average number of days that had elapsed

for these seven steel processors for the years 2001 and 2002 was 47.4 days. He cautioned, however, that this was only an average and merely represented the midpoint for the range of ordinary business terms. Data for determining the actual range and dispersion of such days, he observed, were not included in the SEC filing.

The analysis employed in arriving at this average is dubious at best.

This approach may not be probative in determining what was "ordinary" in the industry for purposes of § 547(c)(2)(C). In the first approach employed in arriving at the first of above two propositions, Nucor–Yamato's expert reviewed the payment history of seven steel processors similar in some way to the debtor to ascertain what was ordinary in the industry. In *Molded Acoustical Products,* however, the standard as formulated therein involved consideration of *creditors* similar in some way to the creditor asserting the ordinary-course defense. *Id.,* 18 F.3d at 224. Instead of considering creditors similar in some way to Nucor–Yamato, its expert considered in the first approach seven steel processors which, like debtor, were *debtors* with respect to the steel producers from which they had purchased steel products.

Serious problems with the first approach employed by Nucor–Yamato's expert abound even if we look beyond this problem. He never explained, for instance, why *any* upward adjustment in the number of days from the invoice date to its payment was appropriate. A factor in making such an upward adjustment was the cost of goods sold. The need for such an adjustment in determining the number of days from the invoice date to the date of its payments Is not self-evident and seems counter-intuitive.

Even if an upward adjustment is appropriate, Nucor–Yamato's expert provided no explanation for why a ten percent adjustment was warranted. Had a ten percent upward adjustment not been made, the reports relied upon by Nucor–Yamato's expert indicate that the average interval would approximate forty-three days. The choice of a ten percent adjustment as opposed to some other adjustment seems arbitrary. We are left with the impression that the ten percent adjustment was utilized so Nucor–Yamato's expert could arrive at a pre-conceived notion of what was needed in this regard if Nucor–Yamato was to prevail in this adversary action.

The problems with the first approach do not end there. In arriving at the conclusion that payments made by debtor up to sixty-five days from the invoice date were "ordinary" for purposes of § 547(c)(2)(C), Nucor–Yamato's expert stated that the industry norm was "at least fifty days".

This is different from his previous assertion that the average interval for the seven steel processors was 47.4 days. An average of 47.4 days is not "at least fifty days". This inconsistency is even more glaring if the upward adjustment of ten percent is entirely disallowed. An average of forty-three days is not "at least fifty days".

This inflation of the average interval in the first approach to "at least fifty" days is not only significant, we are convinced that it also was not inadvertent. As with the ten percent upward adjustment, Nucor–Yamato's expert apparently recognized that if Nucor–Yamato was to prevail in this case, the average interval had to be inflated as much as possible even if the data utilized did not support such inflation.

The second approach utilized by Nucor–Yamato's expert in arriving at the proposition that payments in the industry were made some fifty (or more) days after the

invoice date fares no better than does the first approach.

In the second approach, he examined publicly-available records for the year 2002 for three steel producers allegedly similar to Nucor–Yamato: National Steel; Rouge Steel and Weirton Steel. According to these records, the average interval between an invoice issued by National Steel and the date of its payment by a steel processor was thirty-seven days. It was twenty-eight days for Rouge Steel and was thirty-seven days for Weirton Steel. The overall average for these three steel producers in the year 2002 was thirty-four days.

According to Nucor–Yamato's expert, a substantial portion of the steel produced by National Steel and Rouge Steel is sold to automobile manufacturers, who typically paid within ten to twenty days from the invoice date. A substantial portion of the sales of Weirton Steel, he further maintained, was comprised of tin it produced. Purchasers of tin, he maintained, typically paid within five to twenty days from the invoice date. Because they apparently "skewed" the average intervals for these producers downward, Nucor–Yamato's expert excluded such sales from his analysis and, after a series of hypotheticals, arrived at the conclusion that the adjusted average interval for all other customers of these steel producers was in the range of fifty to sixty days in the year 2002.

Although this second approach differs from the first approach in attempting to ascertain what was "ordinary" for purposes of § 547(c)(2)(C) by looking at steel producers who were creditors instead of looking at steel processors who were debtors, it too is seriously flawed and of dubious probative value.

The proposition that automobile manufacturers and purchasers of tin generally pay invoices considerably sooner than do other steel processors was not objectively substantiated. It was entirely based on the say-so of Nucor–Yamato's expert, which he asserted was derived from his own experience in the steel industry. On occasion we might find such testimony credible, but are not willing to so find in this instance. As was noted previously, we strongly suspect that Nucor–Yamato's expert understood what he had to testify for Nucor–Yamato to prevail in this matter and then said what he had to say to reach such an outcome, even if it meant making wholly unsubstantiated, perhaps arbitrary, statements. The present proposition has that same air about it.

Moreover, exclusion of automobile manufacturers from the expert's calculation in our estimation was arbitrary. Like debtor, they qualify as processors who purchase steel from producers for use in their operations. The reason for their exclusion from the analysis is not hard to figure. Unless they were excluded, the overall average interval between the date an invoice was issued by steel producers and its payment by steel processors during the year 2002 would have been substantially lower than the average interval during the preference period in this case. Only by arbitrarily excluding automobile manufacturers from the calculus would the range common in the industry as a whole approach the average interval during the preference period in this instance.

Finally, even if the exclusion of automobile manufacturers is appropriate, the conclusion that the interval between the invoice date and the day of its payment lies in the range of fifty to sixty days has an air of magic about it. The range arrived at appears to be the result of legerdemain and was tailored to fit the result needed if Nucor–Yamato was to prevail here.

As was noted previously, the conclusion of Nucor–Yamato's expert that payments during the preference that were made up to sixty-five days from the invoice date were "ordinary" for purposes of § 547(c)(2)(C) was based on a second proposition—i.e., that payments in the industry commonly were made in a range of up to fifteen days beyond the average of "at least fifty days" from the invoice date. The testimony offered in support of this proposition fares no better than does the testimony offered in support of the first proposition.

This assertion also is not supported by the analysis of Nucor–Yamato's expert. In asserting that the average number of days between the invoice date and its payment was 47.4 days in the years 2001 and 2002, Nucor–Yamato's expert cautioned that this was merely an average and represented the mid-point of a range of ordinary business terms. The actual range and dispersion, he conceded, were not included in the SEC filings upon which he relied. Despite this *caveat,* however, Nucor–Yamato's expert blithely asserted that payments in the industry commonly were made in a range of up to fifteen days beyond the industry average of "at least fifty days". This proposition, he asserted, was based on his analysis and experience.

We have already concluded that the analysis provided does not support this conclusion. As for his experience, we are as disinclined to give it any weight as we were disinclined to give weight to his previous assertion that the interval between the invoice date and its payment in the years 2001 and 2002 was in the range of fifty to sixty days. This assertion, like the previous assertion, has an air of magic about it and appears to be the result of legerdemain rather than rational analysis support by objective evidence. The assertion that payments ranged up to fifteen day beyond the alleged fifty-day average is as arbitrary and contrived as is the previous assertion.

To summarize our (perhaps tedious) evaluation of the evidence offered through its expert, said evidence does not provide a persuasive basis for determining the broad range of payment terms that are "ordinary" for purposes of § 547(c)(2)(C) in the industry in which processors such as debtor and producers such as Nucor–Yamato do business with one another. As a consequence, no persuasive basis was provided for determining whether the average interval between the invoice date and the date debtor paid it during the preference period was (or was not) so unusual as to fall outside of that broad range of payment terms found in the industry at that time.

We conclude in light of the foregoing that Nucor–Yamato has not met its burden of proving that § 547(c)(2)(B) and (C) are satisfied in this instance and therefore failed to prove that the preferential payments debtor made to it are excepted from discharge by virtue of § 547(c)(2) of the Bankruptcy Code.

An appropriate order shall issue.

### *ORDER OF COURT*

**AND NOW,** this *8th* day of *April,* for reasons set forth in the accompanying memorandum opinion, it hereby is **ORDERED, ADJUDGED** and **DECREED** that judgment in the amount of $837,061.96 be and hereby is entered **IN FAVOR** of plaintiff, the Official Committee of Unsecured Creditors of debtor J. Allan Steel Company and **AGAINST** defendant Nucor–Yamato Steel Company.

It is **SO ORDERED.**