### IN RE: STONE & WEBSTER, INCORPORATED, et al., Debtors.

### Case No. 00–02142 (MFW)

United States Bankruptcy Court, D. Delaware.

Signed February 29, 2016

**12.** The Debtors defined the "effective date" as March 4, 2016. *See* Annex 1 to Revised Proposed Order.

Karen C. Bifferato, Connolly Gallagher LLP, The Brandywine Building, Donald J. Detweiler, Saul Ewing LLP, Gary M. Ford, Groom Law Group, Chtd., Gregg M Galardi, DLA Piper LLP (US), Gary Adam Rubin, Robert Alan Weber, Skadden Arps Slate Meagher & Flom LLP, Wilmington, DE, Douglas N. Currault, II, New Orleans, LA, Eric M. Davis, for Debtors.

### OPINION [1]

Mary F. Walrath, United States Bankruptcy Judge

Before the Court is the Objection of the SWE & C Liquidating Trustee (the "Trustee") to claims filed by Travelers Indemnity Company and its affiliates, including Travelers Casualty and Surety Company ("Travelers"). For the reasons set forth below, the Court will sustain the Objection in part.

### I. *FACTS*

The Aetna Casualty and Surety Company ("Aetna") issued a series of commercial insurance policies to Stone & Webster Engineering Corporation ("S & W") for the period January 1, 1979, to December 31, 1994. (D.I. 6898 at 3.) The policies were retrospective premium ("retro-premium") policies. (Pretrial Order Admitted Facts 7, 8.) Under a retro-premium policy, the insured pays an initial premium and then pays additional premiums based on its loss experience. (6/9/15 Tr. at 71–72.) The retrospective component of the insurance program was set forth in proposals and premium agreements that Aetna sent to S & W as it renewed its insurance annually and established the governing contract for each policy year (the "Retro Agreements"). (Exs. 4–19; 6/9/15 Tr. at 44.)

Generally, the Retro Agreements identified future dates when the insured's actual loss experience would be computed. (Ex. 7 at 2.) Aetna billed S & W for premium adjustments annually under the Retro Agreements from the start of the insurance program through the 1995 adjustment. (6/9/15 Tr. at 75–76; Exs. 31, 32, 33, 34, 39, 40, 41, 44, 45, 47, 48, 52, & 53.) The adjustment became final unless the

insurer or the insured requested a further adjustment within 90 days. (Ex. 7 at 3–4; Ex. 11 at 4.)

In 1996, Travelers acquired Aetna's property and casualty operations and succeeded to Aetna's rights and responsibilities under the Aetna–S & W insurance program. (Pretrial Order Admitted Fact 2.) Travelers did not calculate a premium adjustment in 1996 because of disruptions associated with the merger with Aetna. (6/9/15 Tr. at 74–75.) Travelers resumed premium adjustments in 1997, performing a single adjustment for a two-year period (the "1996–97 Adjustment"). (Ex. 56.) On March 2, 1998, Travelers billed S & W $1,941,086 for the 1996–97 Adjustment. (Ex. 54 at 1.) Travelers negotiated with S & W's insurance broker over the next several months regarding disputed items in the 1996–97 Adjustment, which they ultimately resolved. (6/10/15 Tr. at 86.) During this period, Travelers computed the premium adjustment owed for 1998 (the "1998 Adjustment"). (Ex. 69.) On January 21, 2000, Travelers billed S & W $3,616,053, an amount reflecting the agreed sum owed for the 1996–97 Adjustment and the 1998 Adjustment. (*Id.*)

S & W requested additional time to pay the amount outstanding under the 1996–97 and 1998 Adjustments and agreed to sign a promissory note covering those amounts (the "Promissory Note"). (6/10/15 Tr. at 70.) The interest rate on the Promissory Note was the prime rate of nine percent. (6/10/15 Tr. at 8.) On March 2, 2000, S & W made a payment of $723,210.60 (the "Down Payment") and the remaining balance due ($2,892,842.40) was reflected as the principal amount of the Promissory Note. (6/9/15 Tr. at 43–44; Ex. 606 at ¶ 6.) S & W's treasurer signed the Promis-

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

sory Note on April 3, 2000. (6/9/15 Tr. at 8.) S & W paid Travelers two installments of $301,350.95 each (the "Installment Payments") on the Promissory Note before S & W and its affiliates (the "Debtors") filed chapter 11 petitions on June 2, 2000. (6/9/15 Tr. at 109.) The amount outstanding on the Promissory Note as of the petition date was $2,311,836.82. (Ex. 3 at 5.)

Travelers filed identical proofs of claim in an unliquidated amount against each of the 73 Debtors on August 25, 2000 (the "2000 Claim"). (Ex. 1.) On June 15, 2001, Travelers amended the 2000 Claim, asserting a liquidated amount totaling $7,604,232 (the "2001 Claim"). (Ex. 2.) The 2001 Claim amount included an "ultimate" calculation, or an estimate of what the total premium obligation would be. (6/9/15 Tr. at 43, 51, & 56.) It is Travelers' practice to calculate and submit ultimate claims when an insured files for bankruptcy because it cannot bill a bankrupt post-petition for any adjustment as the loss experience creates additional retro-premium obligations. (6/9/15 Tr. at 52.)

S & W, in its capacity as debtor-in-possession, disputed the amount of the 2001 Claim. S & W and Travelers eventually agreed to a reduced claim of $6,615,514. (6/9/15 Tr. at 84–85; Ex. 604.) On January 16, 2004, S & W's Plan of Reorganization was confirmed. (D.I.4879.) Under the Plan, S & W and its affiliates' assets were transferred to the SWE & C Liquidating Trust. Travelers and S & W filed a motion to approve the settlement of the 2001 Claim, to which the Trustee objected. (D.I.4587, 5453.) As a result of the Trustee's objection, the 2001 Claim settlement was never approved.

In March 2005, the Trustee filed an objection to the 2001 Claim and served discovery on Travelers in June of that year. (D.I.5534.) Travelers objected to several of the discovery requests prompting the Trustee to file a motion to compel in October 2005. (D.I.5793.) In May 2011, the Trustee voluntarily withdrew his motion to compel.[2] (D.I.6563.)

In December 2011, the Trustee moved for summary judgment on his objection to the 2001 Claim. (D.I.6596.) Judge Walsh denied the motion because of the complexity of the underlying factual issues. (D.I. 6649.) Judge Walsh set a pretrial hearing and discovery deadline for December 3, 2012. (D.I.6660.)

In November 2012, Travelers again amended its proof of claim, asserting a claim in the amount of $8,181,492.82 (the "2012 Claim"). (Exs. 3 and 4.) The 2012 Claim consisted of three components: (1) the premium invoiced pre-petition including the amount outstanding on the Promissory Note and the 1999 premium adjustment, totaling $2,642,623.82; (2) a premium due based on S & W's actual loss experience from 1999 to 2012, amounting to $5,226,881; and (3) an estimated future premium for losses incurred but not reported ("IBNR"), amounting to $311,988. (6/9/15 Tr. at 110; Ex. 3 at 6.)

On December 10, 2014, S & W's case was reassigned. (D.I.6844.) Evidentiary hearings were held on June 9, 10, and 12, 2015. The Court took the matter under advisement and directed post-trial briefing. A notice of completion of briefing was submitted on September 10, 2015, and the matter is ripe for decision. (D.I.6951.)

---

**2.** The record is unclear why the motion was withdrawn or why almost six years passed between these two events.

## II. JURISDICTION

The Court has subject matter jurisdiction over this contested matter. 28 U.S.C. §§ 1334(b) & 157(b)(1). The Court may enter a final order in matters concerning claim allowance. *Stern v. Marshall,* 564 U.S. 462, 131 S.Ct. 2594, 2611, 180 L.Ed.2d 475 (2011).

## III. DISCUSSION

### A. Section 502(d)

■ The Trustee argues that the Promissory Note is an avoidable fraudulent transfer under section 548 and that the Installment Payments made on it are avoidable preferential transfers under section 547. Although the two-year statute of limitations for commencing an avoidance action expired before he was appointed, the Trustee argues he is not barred from using avoidance "defensively" under section 502(d). In other words, the Trustee is not seeking to recover money from Travelers by means of an avoidance action; rather the Trustee is seeking the disallowance of Travelers' claim. The Trustee argues that to the extent Travelers is entitled to an allowed claim, it must be disallowed because Travelers has failed to return the Down Payment and Installment Payments (the alleged avoidable transfers) to S & W.

Travelers responds that the Trustee cannot defensively use avoidance through section 502(d) to disallow Travelers' claim because he has not obtained (and cannot obtain—because of the running of the statute of limitations) a judicial determination that the transfers were fraudulent or preferential. *See, e.g., Giuliano v. Mitsubishi Digital Elec. Am. (In re Ultimate Acquisition Partners, LP),* No. 11–10245, 2012 WL 1556098, at \*3 (Bankr.D.Del. May 1, 2012) (holding that "[a] debtor or trustee wishing to avail itself of the benefits of section 502(d) must first obtain a judicial determination on the preference complaint") (citations and internal quotations omitted).

Travelers further argues that in the event the Promissory Note and the payments made are determined to be avoidable, Travelers must have the opportunity to return such payments before its claim is disallowed. *In re KB Toys Inc.,* 736 F.3d 247, 252 (3d Cir.2013) ("Accordingly, 'any claim' falling into this category of claims is disallowable until the avoidable transfer is returned."). *See also In re Asia Global Crossing, Ltd.,* 344 B.R. 247, 251 (Bankr. S.D.N.Y.2006) ("[Section] 502(d) disallows the claim of a creditor that received a transfer avoidable under chapter 5 of the Bankruptcy Code unless the creditor returns the transfer to the estate.") (emphasis omitted).

Section 502(d) provides that "the court shall disallow any claim of an entity ... that is a transferee of a transfer avoidable under section ... 547, 548, ... of this title, unless such entity or transferee has paid the amount, or turned over any such property...." 11 U.S.C. § 502(d). Stated simply, section 502(d) contains two requirements before a court must disallow a claim: (1) a transfer must be avoidable under the applicable section, and (2) the transferee must fail to pay or turn over the avoidable money or property.

An avoidance action must be brought within the later of two years after the commencement of the bankruptcy case or one year after the appointment or election of a trustee (if elected within two years of the commencement of the case). 11 U.S.C. § 546(a)(1). Courts have split over whether a section 502(d) claim objection may be brought if the limitation period of section 546(a) would bar the commencement of an avoidance action. *Compare El Paso v. Am. W. Airlines, Inc. (In re Am. W. Airlines, Inc.),* 217 F.3d 1161, 1167–68 (9th

Cir.2000) (concluding that a trustee may seek disallowance of a claim under section 502(d), even if the underlying avoidance action would be time-barred by section 546(a)) *and In re Loewen Group Int'l Inc.,* 292 B.R. 522, 528 (Bankr.D.Del.2003) (holding that section 544 can be used defensively in opposition to a claim against the estate despite running of statute of limitations in section 546(a)) *with Hoggarth v. Kaler (In re Midwest Agri Dev. Corp.),* 387 B.R. 580, 586 (8th Cir. BAP 2008) (holding that a claim may only be disallowed under section 502(d) if an entity is first adjudged liable under the applicable avoidance section) *and In re Mktg. Assocs. of Am. Inc.,* 122 B.R. 367, 369–70 (Bankr.E.D.Mo.1991) (holding that a trustee must timely assert an avoidance action before relying on section 502(d) to disallow a claim).

The Court finds it unnecessary to determine which view is correct, however. Even if section 502(d) could be used defensively, the Trustee's argument fails because neither the Promissory Note nor the Installment Payments constitute avoidable transfers.

### 1. *Fraudulent Conveyance*

■ The Trustee argues that the Promissory Note was a fraudulent transfer under the Bankruptcy Code and Massachusetts law. *Argus Mgmt. Grp. v. Chanin Capital Partners, LLC (In re CVEO Corp.),* 320 B.R. 258, 264 (Bankr.D.Del. 2005) (finding the requirements under section 548(a)(1) and the Massachusetts Uniform Fraudulent Transfer Act to be substantially the same). The Trustee first asserts that the Promissory Note was an actual fraudulent transfer because it was for no consideration. *See* 11 U.S.C. § 548(a)(1)(A); Mass. Gen. Laws ch. 109A, § 5(a). The Trustee contends that a lack of consideration for the Promissory Note represents a badge of fraud demonstrating that S & W incurred the obligations under the Promissory Note with actual intent to hinder, delay, or defraud other creditors.

Alternatively, the Trustee argues that the Promissory Note was a constructively fraudulent transfer because S & W received less than reasonably equivalent value in return and S & W either (1) was presumed to be insolvent when the Promissory Note was executed, (2) was engaged in business or a transaction, for which the property remaining with S & W was unreasonably small capital, or (3) incurred debts or believed it would incur debts that went beyond its ability to pay as such debts matured. 11 U.S.C. § 548(a)(1)(B); Mass. Gen. Laws ch. 109A, § 5(b).

Travelers responds that the Promissory Note is not a transfer under the Code or the Massachusetts Uniform Fraudulent Transfer Act. Rather, it was simply S & W's affirmation of an already existing debt incurred pursuant to the insurance program as computed in the 1996–97 and 1998 Adjustments. Even if S & W incurred a new obligation via the Promissory Note, Travelers argues that S & W did so in exchange for Travelers' forbearance on the right to collect immediately the retro-premium due for those adjustments.

The Court agrees with Travelers. The Promissory Note was executed to establish a payment plan for an antecedent debt, amounts owed for the 1996–97 and 1998 Adjustments. As a result, S & W received reasonably equivalent value for the Promissory Note. 11 U.S.C. § 548(d)(2)(A) (defining "value" to include "satisfaction or securing of a present or antecedent debt"); *Burtch v. Opus, LLC (In re Opus East, LLC),* 528 B.R. 30, 83 (Bankr.D.Del.2015) ("Payments made on account of valid antecedent debts are presumptively made for reasonably equivalent value."). Therefore, the Court holds that the issuance of the Promissory Note was not a fraudulent con-

veyance and thus provides no basis for disallowance of Travelers' claim under section 502(d).

### 2. *Preference*

The Trustee argues that the Installment Payments are avoidable preferences under section 547 because they were received within 90 days of S & W's bankruptcy petition. Travelers does not dispute that the Installment Payments were received during the preference period. However, Travelers asserts that the Installment Payments were payments of a debt incurred by S & W in the ordinary course of business. *See* 11 U.S.C. § 547(c)(2).

■ Even if a transfer satisfies all the elements of section 547(b), it may not be avoided if the opposing party proves that the transfer satisfies one of the exceptions listed in section 547(c). *Burtch v. Detroit Forming, Inc. (In re Archway Cookies)*, 435 B.R. 234, 240 (Bankr.D.Del.2010). To prove its ordinary course of business defense, Travelers must show that the payments were: (i) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, (ii) made in the ordinary course of business or financial affairs of the debtor and the transferee, and (iii) made according to ordinary business terms. 11 U.S.C. § 547(c)(2) (2004).[3] The burden rests on the transferee to prove by a preponderance of the evidence that the transaction meets the ordinary course of business defense. *Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*, 426 B.R. 106, 110–11 (Bankr.D.Del. 2010).

### a. *Debt Incurred in Ordinary Course*

■ The first requirement under the ordinary course of business defense requires a showing that the original transaction creating the debt is within the ordinary course of dealing between the parties. *CVEO Corp.*, 320 B.R. at 263 (citing *Official Comm. of Unsecured Creditors v. Liberty Sav. Bank, FSB (In re Toy King Distribs., Inc.)*, 256 B.R. 1, 114 (Bankr. M.D.Fla.2000)). This requirement examines whether the underlying debt on which the alleged preferential transfers were made was incurred by the debtor in the ordinary course of business or financial affairs of both parties.

Travelers argues that the underlying debt represented by the Promissory Note was incurred under normal circumstances. The Court agrees. From the inception of the insurance program in 1979 through 1995, it is undisputed that S & W regularly paid Aetna premium adjustments pursuant to the Retro Agreements. S & W only ceased paying amounts owed when its deteriorating financial condition precluded payment of the 1996–97 and 1998 Adjustments. In response to these adverse conditions, Travelers and S & W agreed to the Promissory Note after S & W's insurance broker was unable to obtain third-party financing to pay the amounts owed. (Ex. 91 at 2.) It was typical for Travelers to negotiate with policyholders in such circumstances to devise a payment plan, including the issuance of a promissory note. (6/10/15 Tr. at 7–8.)

---

**3.** Section 547(c) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Although this adversary proceeding was filed after the October 17, 2005, effective date of BAPCPA, the main case was commenced prior to that date. Therefore, the BAPCPA amendments are inapplicable. *See* BAPCPA, Pub.L. No. 109–8, § 1501(b)(1), 119 Stat. 23 (2005) ("[The amendments made by this Act shall not apply with respect to cases commenced under title 11, United States Code, before the effective date of this Act."). *See Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*, 427 B.R. 301 (Bankr.D.Del.2010).

Importantly, the Promissory Note and the Installment Payments made thereto only changed the payment terms of the adjustment premium already due. Thus, the Promissory Note simply evidenced a payment plan agreed to by both Travelers and S & W for pre-existing obligations under a long-standing insurance program. *See, e.g., In re Magic Circle Energy Corp.*, 64 B.R. 269, 273 (Bankr.W.D.Okla.1986) ("The mere restructuring of payment terms does not alter the fact that the underlying debt was incurred in normal circumstances."). For these reasons, the Court finds that the first requirement of section 547(c)(2) is satisfied.

b. *Ordinary Course Between the Parties*

■ The second requirement of the ordinary course of business defense is a subjective test involving the consistency of transfers between the debtor and the creditor before and during the preference period. *Burtch v. Prudential Real Estate and Relocation Servs., Inc. (In re AE Liquidation, Inc.)*, No. 08–13031, 2013 WL 3778141, at \*5 (Bankr.D.Del.2013) (citations omitted). Courts rely on a wide range of factors in determining such consistency; including: (i) the length of time the parties engaged in the type of dealing at issue; (ii) whether the subject transfers were in an amount more than usually paid; (iii) whether the payments at issue were tendered in a manner different from previous payments; (iv) whether there appears to have been any unusual action by the creditor or debtor to collect on or pay the debt; and (v) whether the creditor did anything to gain an advantage (such as obtain additional security) in light of the debtor's deteriorating financial condition. *Id.* (citations omitted); *Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Del., Inc.)*, 320 B.R. 541, 548–49 (Bankr.D.Del.2004). No one factor is dispositive; rather courts take into account the relationship between the

creditor and debtor throughout the entire preference period. *Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, 463 B.R. 302, 306 (Bankr. D.Del.2012).

i. *Length of Engagement*

■ Under this factor, the Court "must consider whether the relationship between the creditor and debtor was of recent origin, as opposed to being cemented long before the onset of insolvency." *AE Liquidation*, 2013 WL 3778141 at \*5 (citations and internal quotations omitted). In this case, Travelers began providing S & W insurance coverage in 1979, over twenty years before the Promissory Note was executed. (Pretrial Order Admitted Fact 1.) The extended duration of the business dealings between S & W and Aetna offers Travelers greater flexibility in fitting within the section 547(c)(2) defense. *Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 225 (3d Cir.1994) ("[T]he more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of section 547(c)(2).").

With the exception of the delay caused by the merger in 1996, Travelers (and formerly Aetna) annually calculated and billed for retro-premium adjustments while S & W, in return, paid those premiums and benefitted from the handling and payment of the insured claims filed against it. Additionally, S & W and its insurance broker typically negotiated with Aetna/Travelers following receipt of a notice of annual adjustment to discuss disputed items, often leading to reduction in the premium owed in a given period. Such relationship characteristics exemplify not

only longevity, but involved and sophisticated business relations between the parties. These considerations persuade the Court to find that the length of engagement factor supports Travelers' position.

### ii. *Similarity of Transactions*

 Under this factor, the Court "must compare the [t]ransfers in the [p]reference [p]eriod to the transfers made during the prior course of the parties' business relationship to determine if the transactions were sufficiently similar." *AE Liquidation*, 2013 WL 3778141 at *5. The Trustee insists that the Promissory Note and Installment Payments are dissimilar to previous transfers because never before had S & W paid Aetna pursuant to the terms of a promissory note. Though technically true, the Court finds the Trustee's position concerning the application of the "similarity of transactions" element to be too narrow. Transfers made during the preference period "need not ... possess a rigid similarity to each past transaction." *Official Comm. of Unsecured Creditors v. Brown (In re Cherrydale Farms, Inc.)*, No. 99–597, 2001 WL 1820323, at *3 (Bankr.D.Del.2001) (citations and internal quotations omitted). Additionally, "[T]he transaction need not have been common; it need only be ordinary." *Id.*

While not rigidly similar to previous payments for premium adjustments, the Promissory Note and Installment Payments were still the payment of a premium adjustment made under the insurance program. The Court does not attribute enough weight to this variation to deem the Promissory Note and Installment Payments significantly dissimilar to previous premium payments made pursuant to the Retro Agreements.

### iii. *Collection Efforts*

 Unusual collection activity by a creditor during the preference period can defeat an ordinary course of business defense. *AE Liquidation*, 2013 WL 3778141 at *7 (citing *Montgomery Ward LLC v. OTC Int'l, Ltd. (In re Montgomery Ward, LLC)*, 348 B.R. 662 678 (Bankr.D.Del. 2006); *Molded Acoustical*, 18 F.3d at 225.

Travelers argues it never engaged in any unusual collection activity and the Trustee has presented no evidence indicating otherwise. Travelers engaged in arms-length negotiations with S & W's insurance broker regarding repayment options for the outstanding premium due under the 1996–97 and 1998 Adjustments. These discussions resulted in terms which favored S & W, not Travelers: namely, the ability to pay the debt over time rather than in a lump sum. (Ex. 91 at 2.) *See Molded Acoustical*, 18 F.3d at 225 ("[I]t is the potential manipulation of the credit schedules, the threat or initiation of legal action, or other unusual behavior designed *to improve the lot of one creditor at the expense of the others* at a time when bankruptcy looms on the horizon of an infirm debtor-to-be that invokes the need to subdue a creditor's predilection toward self-aggrandizing behavior.") (emphasis added). There is no evidence that S & W made the Installment Payments in response to unusual collection efforts exerted by Travelers. For these reasons, the Court holds this factor supports Travelers' ordinary course of business defense.

### iv. *Advantage in Light of S & W's Condition*

A creditor typically attempts to take advantage of a debtor's financial condition by requesting additional collateral or security, assessing late fees, or pressuring the debtor for payment. *Am. Home Mortg.*, 476 B.R. at 140. Travelers argues that the Promissory Note and the Installment Payments made in connection therewith were not the result of pressure but rather the result of arms-length negotiations.

Travelers further notes that the contested transfers were made consistent with the Promissory Note's terms; each were made within one day of the due date. Considering each Installment Payment was tendered timely, there was no occasion for Travelers to assess late fees or penalties or otherwise pressure S & W for payment. Additionally, Travelers never requested security for the Promissory Note.

For these reasons, the Court finds that Travelers did not take advantage of S & W's financial condition when it accepted the Promissory Note and the Installment Payments made on it. Considering the preceding factors, the Court concludes that Travelers has met its burden of demonstrating that the Installment Payments were made in the ordinary course of the parties' respective business or financial affairs. 11 U.S.C. § 547(c)(2)(B) (2004).

#### c. *Ordinary Business Terms*

■ The third requirement of the ordinary course of business defense is that the disputed transfers be made according to "ordinary business terms" in the industry. 11 U.S.C. § 547(c)(2)(C) (2004). Travelers asserts that the Installment Payments were made according to ordinary business terms because promissory notes are not unusual for Travelers or for the insurance industry at large. (6/10/15 Tr. at 7; Ex. 608 at ¶ 19.) Furthermore, Travelers argues that provisions imposing interest and requiring installment payments are typical terms of promissory notes. (6/10/15 Tr. at 8.)

Alternatively, Travelers argues that even if the Promissory Note included terms that vary from industry norms, it should be granted flexibility because of the parties' long-standing business relationship. *See Molded Acoustical,* 18 F.3d at 220 (holding that a creditor may deviate from the industry norms when the parties have a long-standing business relationship).

■ In *Molded Acoustical,* the Third Circuit held that "ordinary business terms" as used in section 547(c)(2)(C)

> refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and ... only dealing so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

*Id.* at 220 (internal quotation omitted). Additionally, "the 'ordinary business terms' test ... is necessarily a broad one, and the evidentiary standard is not formidable." *Am. Home Mortg.,* 476 B.R. at 141.

Travelers has presented evidence that use of promissory notes when an insured is unable to pay for premium adjustments is customary in the insurance industry. (*See* Ex. 608 at ¶ 19.) Though the Trustee stresses that S & W and Travelers had never before used a promissory note, the Court does not attribute significance to this fact. The ordinary business terms test focuses on the terms of the agreement in question in relation to terms included in similar agreements in the industry, not to similar agreements previously executed by the parties. *See, e.g., Cherrydale Farms,* 2001 WL 1820323, at *3 (holding that the ordinary business terms requirement looks to general norms within the creditor's industry).

Travelers has proved that it was ordinary in the industry to accept promissory notes in similar instances and the Trustee has presented no evidence to contradict this. (Ex. 608 at ¶ 19.) For these reasons, the Court finds that the Promissory Note and the Installment Payments paid thereunder were made according to ordinary business terms. Thus, even if the trans-

fers were preferences, Travelers has established a defense. Therefore, the Court concludes that the transfers are not avoidable under section 547 and provide no basis for disallowance of Travelers' claim under section 502(d).

### B. *Unclean Hands*

The Trustee also argues that the equitable doctrine of unclean hands bars Travelers' recovery of the 2012 Claim. The Trustee asserts two instances where Travelers' conduct implicates the unclean hands doctrine: (1) Travelers' failure to attach the Promissory Note to its 2000 and 2001 Claims and failure to produce the Promissory Note later; and (2) Travelers' failure to disclose in its proofs of claim that it was including an "ultimate" calculation.

Travelers responds that its failure to attach the Promissory Note was the result of a clerical error. Travelers contends that had it intended to conceal the Promissory Note, it would not have listed it as an attachment on the 2000 and 2001 Claims. Travelers also disputes the Trustee's assertion that the Promissory Note was withheld, instead noting that it promptly produced the Promissory Note once the Trustee requested it.

In response to the Trustee's "ultimate" disclosure argument, Travelers asserts that the 2001 Claim expressly stated that the premium due was based in part on "WC Ultimate Losses." (Exs. 1 & 2.) Travelers contends that even if the Trustee did not understand what the term meant, at the very least it put the Trustee on notice to inquire further.

"To prevail on an 'unclean hands' defense, the defendant must show fraud, unconscionability, or bad faith on the part of the plaintiff." *Sonowo v. U.S.,* No. CIV. A. 03–1122, 2006 WL 3313799, at *3 (D.Del. Nov. 13, 2006) (citing *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d

371, 377 n. 7 (3d Cir.1992)). "As an equitable doctrine, application of unclean hands rests within the sound discretion of the trial court. Moreover, neither [the Third Circuit Court of Appeals] nor the Supreme Court has required ... that application of the unclean hands doctrine is mandatory." *New Valley Corp. v. Corporate Prop. Assoc. 2 and 3 (In re New Valley Corp.),* 181 F.3d 517, 525 (3d Cir.1999) (citations omitted).

The Court concludes that Travelers' failure to attach the Promissory Note was the result of an inadvertent error which alone is insufficient to support a finding of the intent necessary to implicate the unclean hands doctrine. *Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.,* 69 Fed.Appx. 550, 556 (3d Cir.2003) (no finding of unclean hands without evidence that "omission was knowing or intentional").

Further, any failure to attach the Promissory Note had no direct connection to Travelers' claim amount or validity. *New Valley,* 181 F.3d at 525 ("When applying the [unclean hands] doctrine, the courts in [the Third Circuit] have generally been clear that the connection between the misconduct and the claim must be close."). The Promissory Note simply memorialized a payment plan for part of the retro-premium allegedly owed pre-petition.

The Court finds that the Trustee's assertion that Travelers knowingly concealed the ultimate calculation portion of the 2012 Claim is also unfounded. The 2001 Claim included several references to the term "ultimate." At the very least, these references put the Trustee on notice to inquire further into how Travelers computed its claim. For these reasons, the Court holds that Travelers' conduct does not justify disallowance of the 2012 Claim based on the unclean hands doctrine.

### C. *Legality*

██ The Trustee argues that the Retro Agreements are illegal and unenforceable. Specifically, the Trustee asserts that the Retro Agreements are not on forms approved by insurance regulators, rendering the proposals invalid and unenforceable. Travelers responds that the Trustee's illegality defense is barred by the doctrine of laches because it did not raise the defense until May 2015, ten years after the Trustee's initial objection to Travelers' proofs of claim and fifteen years after its original claim was filed. Alternatively, Travelers argues that no evidence exists in the record that the requisite forms were not filed with state regulators.

Even if the forms were not filed, however, Travelers contends that the Retro Agreements are still enforceable between S & W and Travelers. Travelers argues that a party that has benefitted from insurance is estopped from avoiding its obligations under unfiled or allegedly unenforceable premium agreements. *Reliance Ins. Co. v. Woodward–Clyde Consultants*, 243 Fed.Appx. 674, 675 n. 3 (3d Cir.2007); *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 998 (2d Cir.1996). Travelers contends that the majority of jurisdictions considering the effect of an insurer's failure to file a state-mandated insurance policy form have concluded that such an omission does not render the policy invalid. *See FDIC v. Am. Cas. Co.*, 975 F.2d 677 (10th Cir.1992); *Highlands Ins. Co. v. Am. Marine Corp.*, 607 F.2d 1101 (5th Cir.1979); *John Beaudette, Inc. v. Sentry Ins.*, 94 F.Supp.2d 77, 140 (D.Mass.1999).

The Court agrees with Travelers. In *Reliance*, the insurer issued policies for workers' compensation and automobile insurance. 243 Fed.Appx. at 675. Each year, the insurer and the insured signed separate premium agreements setting forth retrospective terms. *Id.* However, the insurer failed to file the premium agreements with state insurance regulators. *Id.* Notwithstanding the insurer's omission, the Third Circuit held that the insured was estopped from arguing the illegality of the premium agreements after it had accepted the benefit of them. *Id. See also Ionosphere*, 85 F.3d at 1001 (holding debtor estopped from arguing illegality of insurance agreement after accepting the benefit of the contract). As in *Reliance*, S & W has accepted the benefits under the Retro Agreements, as Travelers continues to pay claims arising under the Retro Agreements. Therefore, the Court concludes that the Trustee is estopped from arguing the illegality of the Retro Agreements.

### D. *Lack of Endorsement*

██ The Trustee also argues that Aetna's failure to endorse the Retro Agreements to the policies, as required by the express terms of the policies, renders the Retro Agreements unenforceable. In support of his argument, the Trustee asserts that only three of the sixteen Retro Agreements were properly endorsed to the policies.

Travelers argues that even if the endorsements were omitted, the parties did in fact modify the terms of the policies through oral agreements and by performance. Travelers contends that language in the policies prohibiting a change or waiver except by written endorsement is not dispositive under Massachusetts law if the conduct of the parties indicates otherwise. Travelers argues that the nearly twenty years of performance, during which myriad contractual obligations were honored, demonstrates a course of conduct supporting an implied contract based on the Retro Agreements.

Under Massachusetts law, the inclusion of a clause stating that a policy can only be modified by a written endorsement is not dispositive. *Zurich Am. Ins. Co. v. Watts Regulator Co.,* 860 F.Supp.2d 78, 87 (D.Mass.2012) ("A provision that an agreement may not be amended orally but only by a written statement . . . does not necessarily bar oral modification of the contract."). However, "The evidence of a subsequent oral modification . . . 'must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires consent to modification, expresses the intent of the parties.'" *Id.* at 87–88 (quoting *Flynn v. Wallace,* 359 Mass. 711, 715, 270 N.E.2d 919 (1971)).

The Court finds that the conduct of Aetna and S & W is sufficient evidence to overcome the presumption that any modification had to be in writing. That evidence includes the renewal of the insurance program for sixteen years, the regular billing by Aetna and payment by S & W of retro-premium adjustments, and S & W's periodic negotiations with Aetna regarding disputed items in the annual adjustment. This clearly evidenced a mutual intent of the parties to modify the policy terms by incorporating the terms of the Retro Agreements. Accordingly, the Court holds that the failure to endorse the Retro Agreements to each policy does not render them unenforceable.

### E. *Waiver*

The Trustee argues that even if the Retro Agreements are deemed enforceable, Travelers waived its right to collect under them by failing to bill for any additional premium in 1996. The Trustee argues that it was a condition precedent to any further obligation under the Retro Agreements that adjustments be computed each year.

Travelers responds that its delay in making one adjusted premium computation did not constitute a waiver of its right to recover that and all future retro-premiums under the Retro Agreements. Travelers also argues that the annual adjustment provision in the Retro Agreement is not a condition precedent to any further recovery.

Under Massachusetts law, both express and implied waivers may be "inferred by a party's conduct, where the conduct is consistent with and indicative of an intent to relinquish voluntarily a particular right such that no other reasonable explanation of the conduct is possible." *KACT, Inc. v. Rubin,* 62 Mass.App.Ct. 689, 695, 819 N.E.2d 610 (2004) (citations and internal quotations omitted). The party asserting a waiver has occurred bears the burden of proof. *Commercial Masonry Corp. v. Bartletta Eng'g Corp.,* No. PLCV200800514B, 2014 WL 1758057, at *17 (Mass.Super.Mar. 12, 2014).

In light of the parties' lengthy business relationship and the fact that the merger of Aetna and Travelers in 1996 caused a disruption in the business, the Court finds that Travelers' delay in billing for the 1996 adjustment does not represent "clear, decisive, and unequivocal" conduct of the nature required under Massachusetts law to prove an implied waiver of the right to collect any future retro-premiums. *KACT, Inc.,* 62 Mass.App.Ct. at 695, 819 N.E.2d 610 (internal citation and quotation omitted).

The case cited by the Trustee to support his position is distinguishable. *See In re Flanigan's Enters, Inc.,* 130 B.R. 904 (Bankr.S.D.Fla.1991). In *Flanigan's,* the premium agreement at issue provided that "a calculation shall be made . . . *immediately* after the discontinuance of the policy, to determine whether there should be any

adjustment of premiums." *Id.* at 907 (emphasis in original). Following cancellation of the insured's policy, the insurer made no adjustments for four years. *Id.* Only after the insured filed for bankruptcy and confirmed a plan did the insurer seek to assert a claim. *Id.* at 906. The court rejected the insurer's claim, reasoning that usage of the word "immediately" in the premium agreement required the insurer to notify the insured of its claim much earlier.

Several facts distinguish *Flanigan's* from the instant case. First, the issue in *Flanigan's* was whether the insurer should be allowed to file a late proof of claim, while in this case Travelers timely filed its proofs of claim. Second, the language of the premium agreements in *Flanigan's* (specifically use of the word "immediately") demanded instant action from the insured. In contrast, the premium agreements in the instant case require Travelers to compute annual adjustments "promptly" and permits additional premium adjustments to be calculated at the request of S & W or Travelers. *(See, e.g.,* Ex. 7 at 2–3.) Third, Travelers was in regular contact with S & W and its broker during 1996 and the parties negotiated the proper premium adjustment ultimately agreeing on the amount due. This is in stark contrast to *Flanigan's* where the insurer waited over four years even to seek an adjustment.

 Even if the Court were persuaded by the Trustee's waiver defense, its argument would fail for a second reason. S & W continued dealing with Travelers after 1996 without asserting that Travelers had waived the right to collect any further retro premiums. *(See, e.g.,* Exs. 55, 58, and 77.) By doing so, the Court concludes that S & W waived its right to contest the continuation of its obligation to make retro-premium payments under the Retro Agreements. *Egenera, Inc. v. Forest St. Bldg. 165 LLC,* No. MICV201102208F, 2013 WL 2152185, at *8 (Mass.Super.Ct. May 7, 2013) ("[A] waiver may ... be established by conduct of the parties who continue to deal after a deadline has passed which would have resulted in a discharge of the party's obligations.") Though S & W and its insurance broker disputed specific items associated with the 1996–97 Adjustment, they never objected to Travelers' right to continue billing under the Retro Agreements. After reaching an agreement concerning the disputed items, Travelers and S & W resumed their prior course of dealing, with Travelers calculating and billing for the 1998 Adjustment and subsequent adjustments. The Court, therefore, concludes that the Trustee has not met his burden of demonstrating that Travelers' delay in billing for the 1996–97 Adjustment constituted an implied waiver or was a condition precedent to S & W's obligation to pay any further retro-premiums.

### F. Multiple Uncertainties

The Trustee argues that the Retro Agreements are unenforceable because of purported uncertainties concerning which policies are subject to the Retro Agreements. The Trustee contends that a lack of source documentation and other clerical errors uncovered in the discovery process raises uncertainty as to whether Travelers attributed insurance claims to the proper policy.

Travelers responds that such uncertainties are non-existent considering the evidence showing that every claim payment included in the 2012 Claim arose under a retro-premium policy issued by Aetna. Travelers further contends that the clerical errors were immaterial and unrelated to the retro-premium calculations.

The Court agrees with Travelers. There is no evidence that entire claims were attributed to incorrect policies. The manager of Travelers' account resolution department testified that the ultimate calculation included in the 2012 Claim drew exclusively from claims under one of the Retro Agreements. (6/9/15 Tr. at 63; 6/12/15 Tr. at 88–89.) The Trustee has failed to offer any evidence contradicting that testimony. Therefore, the Court concludes that the Retro Agreements are enforceable.

### G. Timeliness of Proof of Claim

 The Trustee argues that the 2012 Claim should be disallowed as untimely. Travelers responds that it filed its original claim before the bar date and had the right to amend its claim after the bar date. Travelers notes that amendments to retro-premium claims are expected and that the gap between the 2001 Claim and the 2012 amendment is justified by the Trustee's inaction in the interim. Travelers further contends that the Trustee presented no evidence that the 2012 Claim rendered the Plan infeasible or altered the distribution to other creditors.

 The Court agrees with Travelers. As a general proposition, amendments of timely claims following the bar date are permitted to describe the claim with greater specificity or even to plead a new theory of recovery on facts established in the original claim. See In re Norris Grain Co., 131 B.R. 747, 750 (M.D.Fla.1990). Only "amendments" which assert an entirely new claim after the bar date are prohibited. See, e.g., Plains Mktg., L.P. v. Bank of America, N.A. (In re SemCrude, L.P.), 443 B.R. 472, 477–78 (Bankr.D.Del. 2011) (allowing claim amendment after the bar date because amendment did not represent a new claim).

The necessity of post-bar date claim amendment is even more acute with retro-premium claims. The White Motor Corp. case is directly on point and persuasive. In re White Motor Corp., 59 B.R. 286 (Bankr.N.D.Ohio 1986). In that case, the insurer's proposed claim amendment asserted the same claim for premiums included in the timely filed claim; it simply increased the amount to reflect more accurately the liability due under the policies. Id. at 289. The Court reasoned that because retrospective claims are based on actuarial estimates, claim amendments are necessary because the passage of time allows real amounts to be substituted for estimates, stating that "[i]t is apparent from the very nature of the within claim ... that quantification is not readily ascertainable. Consequently, it is imperative to allow the amendment to provide [the insurer] the opportunity to prove its actual claim." Id. Therefore, the Court concludes that Travelers had the right to amend its timely original claim.

Further, the Court concludes that the delay between Travelers' original claim and the amended claim was not unreasonable in light of the prolonged proceedings in this case. For example, the Trustee did not object to Travelers' 2001 Claim until March 28, 2005. The initial hearing on the objection occurred in May 2005, with the parties agreeing to conduct discovery. It was not until December 2011 that the Trustee moved for summary judgment. When Judge Walsh issued his letter ruling in May 2012, it became apparent that an evidentiary hearing would be required to resolve the dispute. (D.I.6649.) Travelers amended the claim approximately six months later. Thus, while the eleven year gap between the 2001 and 2012 Claims may suggest delay, the history of this particular dispute instructs otherwise. Accordingly, the Court holds that the 2012 Claim was not untimely.

## H. *Letters of Credit*

The Trustee argues that if Travelers is entitled to an allowed claim, the claim must be reduced by $1,986,482 representing the proceeds it received pre-petition from drawing on letters of credit. Travelers responds that the proceeds from the letters of credit were not property of S & W's estate and its claim cannot be reduced by such proceeds unless and until there is a danger of a double recovery.

 It is well-established that a letter of credit and proceeds therefrom are not property of a debtor's estate. *See Int'l Fin. Corp. v. Kaiser Grp. Int'l Inc. (In re Kaiser Grp. Int'l Inc.)*, 399 F.3d 558, 566 (3d Cir.2005); *OHC Liquidation Trust v. Discover Re (In re Oakwood Homes Corp.)*, 342 B.R. 59, 67 (Bankr.D.Del.2006). The Trustee's reliance on *Sacred Heart Hospital* for the proposition that a creditor's claim must be reduced "dollar-for-dollar" by insurance proceeds received pre-petition omits an essential fact present there: that case concerned insurance proceeds that *were* property of the estate. *In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413, 421 (Bankr.E.D.Pa.1995).

 Therefore, unless Travelers receives payment in full of the amount owed, the proceeds from the letters of credit will not reduce its claim. *See, e.g., Reconstr. Fin. Corp. v. Denver & R.G.W.R. Co.*, 328 U.S. 495, 529, 329 U.S. 679, 66 S.Ct. 1384, 90 L.Ed. 1400 (1946) ("The rule is settled in bankruptcy proceedings that a creditor secured by the property of others need not deduct the value of that collateral or its proceeds in proving his debt."); *Ivanhoe Bldg. & Loan Ass'n v. Orr*, 295 U.S. 243, 247, 55 S.Ct. 685, 79 L.Ed. 1419 (1935) ("A creditor holding security who realizes upon it, does not 'owe' his debtor the amount realized."). The Trustee presented no evidence that unsecured creditors will receive sufficient distributions that result in Travelers receiving a double recovery. Therefore, the Court concludes that the proceeds from the letters of credit do not reduce Travelers' 2012 Claim.

## I. *Negligent Claim Handling*

The Trustee argues that the 2012 Claim should be disallowed because Travelers has not provided the source documentation which supports the premium owed based on S & W's loss experience from 1999 through 2012. The Trustee asserts that the refusal to produce source documentation (including the actual claims files) has foreclosed the Trustee's opportunity to test Travelers' good faith handling and settling of the insurance claims.

Travelers replies that it produced voluminous documentation supporting the 2012 Claim, including (i) the Retro Agreements, (ii) billing files, (iii) the Promissory Note, (iv) loss run reports, and (v) other summaries and schedules. Travelers also produced claim notes, claim summaries, and selected pay out histories. (6/12/15 Tr. at 84.) Travelers argues that it was not required to produce the underlying claim files on which the loss run reports, and its claim, are premised. The Trustee disagrees.

### 1. *Burden of Proof*

 The burden of proof for claims under section 502(a) rests on different parties at different times. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir.1992). A claimant bears the initial burden of demonstrating it has a valid claim and the amount of that claim. "Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is 'prima facie' valid." *Id.* (citations omitted). The burden then shifts to the objector to produce sufficient evidence to negate a sworn fact in the proof of claim. *Id.*

If the objector does, the ultimate burden ordinarily remains on the claimant to prove the validity of the claim. *Id.* at 174. However, in instances where non-bankruptcy law identifies the burden of proof, the ultimate burden of proof for a particular claim is determined consistent with that law. *Raleigh v. Ill. Dep't Rev.*, 530 U.S. 15, 20–21, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000); 4 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 502.02[3][f] (16th ed.2015).

Travelers' original and amended proofs of claim represent prima facie evidence of the validity of its claim, thus satisfying its initial burden. The Trustee was then required to present sufficient evidence to refute the claim. The Trustee identified certain errors in Travelers' claim handling process calling into question the accuracy of the 2012 Claim. For instance, the Trustee identified an indemnification claim expunged by the Court, though Travelers continued to assert a reserve in its claim for it. (6/12/15 Tr. at 35–36; Ex. 315.) In another instance, the Trustee's expert identified a reserve for approximately $108,754 despite only $6,245 having been paid on the claim since it arose on December 30, 1994. (6/12/15 Tr. at 95.) In light of such evidence, the Court concludes that the Trustee satisfied his burden in overcoming the prima facie validity of the 2012 Claim.

■ Accordingly, the final burden of persuasion rests with whomever bears it under Massachusetts state law. *See Raleigh*, 530 U.S. at 20–21, 120 S.Ct. 1951. Massachusetts has adopted an evidentiary burden-shifting framework for disputes involving negligent insurance claim handling. *See Deerfield Plastics Co., Inc. v. Hartford Ins. Co.*, 404 Mass. 484, 536 N.E.2d 322

(1989).[4] Though each rely on *Deerfield Plastics*, the parties interpret the holding in that case differently. The Trustee argues that *Deerfield Plastics* first places the burden on the insurer to show that it acted reasonably in making settlements where the money of the insured is involved. Travelers counters that the burden is first on the insured to present evidence of negligent claim handling before the burden shifts to the insurer to demonstrate reasonableness and good faith.

The Court agrees with Travelers. In *Deerfield Plastics*, the insurer did not dispute that it was negligent in its claim handling. *Id.* at 485, 536 N.E.2d 322. Thus, the insured had already met its burden on that point. The issue presented in *Deerfield Plastics* was only who bore the burden of proof *after* the insured presents evidence of negligent claim handling. *See New Eng. Mut. Life. Ins. Co. v. Bear Hill Nursing Home, Inc.*, No. CA924260, 1995 WL 808629, at *3 (Mass.Super.Mar. 24, 1995). Accordingly, the Court must first determine whether the Trustee presented sufficient evidence to satisfy its burden of showing negligent claim handling by Travelers (or Aetna).

■ To meet its initial burden, however, the insured must have access to all the relevant information underlying the claim handling. In a decision applying a similar burden-shifting framework to that in *Deerfield Plastics*, the Court took into consideration the conditions necessary for the insured to produce evidence of the insurer's negligence:

> In allocating to the insured this burden of coming forward with evidence, we have taken into consideration that the insurer will ordinarily have superior

---

4. The parties agree that Massachusetts state law governs this dispute. (D.I. 6802 at n.2; D.I. 6925 at n.2.)

knowledge of the facts bearing on the issue. Of necessity, then, wide latitude must be given the insured in pretrial discovery. It seems unlikely that an insured will undertake the considerable expense of an extended inquiry into every case file without some reasonable suspicion that the insurer failed in its implied obligation. If the insured wishes such an inspection, however, modern discovery techniques are entirely sufficient to permit it, and the parties may thereby determine the existence of legitimate issues that should properly be brought before the court.

*Port East Transfer, Inc. v. Liberty Mut. Ins. Co.,* 330 Md. 376, 386–87, 624 A.2d 520 (1993).

As the Court in *Port East Transfer* noted, liberal discovery is critical to level the playing field in light of the insurer's superior knowledge of the relevant facts. To meaningfully test an insurer's claim handling process, it is paramount that the insured be afforded an opportunity to examine substantially the same information the insurer relied on in resolving the underlying loss claim. If, however, the insured is restricted to insurer-prepared summaries of source information, the ability to conduct this inquiry is restricted.

Travelers asserted in a declaration accompanying its motion in limine that production of all documents comprising the claim files would be difficult:

> The file for any particular claim will include both physical documents and computer stored information. The physical file will reside in the location where the claim is being adjusted.... In order to provide a claim file to an insured, it is necessary to locate the physical file and also to download and print the electronically stored portions of the file. This can be a substantial undertaking and can substantially dis-

rupt claims handling activities. Open claim files are in constant use, so delivering the original counterpart of such files in a remote location may make it extremely difficult for adjustors to carry on their work.

(Ex. 645 at ¶ 9.) Nonetheless, on March 6, 2015, the Court ordered Travelers

> to provide the Trustee, within sixty days of the entry of this Order, the opportunity to review all documents on which the Loss Runs are premised pursuant to Federal Rule of Evidence 1006, in order to confirm that the Loss Runs are an accurate summary of the applicable writings.

(D.I. 6874 at 2.)

Travelers argues that the phrase "all documents on which the Loss Runs are premised" meant only other summarized information such as claim notes, claim summaries, and other condensed financial statements. (6/12/15 Tr. at 87.) It contends that the Loss Runs (which are summaries of the amounts paid for each claim handled by Travelers accompanied by basic claim information) derive from information entered into Travelers' electronic claims management system and summarize the payment information that appears in the claim financials. (6/9/15 Tr. at 99; Exs. 74F & 74G.) Thus, it argues that it was *not* required to give the Trustee any of the underlying claim files. The Court disagrees. The documents produced by Travelers simply reflect all payments issued and other *financial* activity relating to each claim. They do not provide any evidence of the validity of the underlying loss claim or how Travelers determined that those claims should be paid. (6/10/15 Tr. at 42, 58–59; Ex. 160.)

The claim notes produced were similarly unhelpful to the Trustee. According to the Trustee's expert witness, claim notes

consist of an entry system where different employees at different times will access a computer document and enter their activities. (6/12/15 Tr. at 92.) The Trustee's expert witness further testified that it is necessary when conducting a claims audit to possess the actual claim file itself in order to evaluate the claim management process, as reflected in the claim notes, against the source documents. (*Id.*) The documents produced by Travelers did not include the underlying case files or their photographs, medical reports, apportionment worksheets or correspondence with the claimant. (*Id.* at 92–93.) The Trustee's expert witness testified that the latter are critical to determining whether the claim handling was negligent. (6/12/15 Tr. at 96–97.)

Notwithstanding the Court's March 6 ruling, Travelers elected to withhold the underlying source information, including the actual physical claims files, that may have assisted the Trustee in meeting his burden. It did so, although it acknowledged that "the claim handling process for each claim is thoroughly documented in a physical claim file that is maintained for that claim, including witness statements, pictures, adjustors' notes, among other things." (Ex. 644 at ¶ 10.) Without access to the documents in the claim files, the Trustee's ability to put forth evidence of negligent claim handling was severely curtailed.

■ In light of Travelers' refusal to produce the physical claim files to the Trustee, the Court draws an adverse inference that had Travelers produced all relevant information, the Trustee would have met his burden at this stage. *See Auto. Insurers Bureau of Mass. v. Comm'r of Ins.*, 430 Mass. 285, 291, 718 N.E.2d 830

(1999) ("In appropriate circumstances, a fact finder in a civil dispute may draw a negative inference from the failure of the party with the burden of proof to call a witness or produce information within the party's control which would shed light on the party's position on a material issue.") (citations omitted).

Under *Deerfield Plastics*, the burden now shifts back to Travelers to demonstrate that it acted reasonably and in good faith in handling the underlying claims. *Deerfield Plastics*, 404 Mass. at 487, 536 N.E.2d 322. Travelers did not present any evidence on this issue, asserting instead that the Trustee had failed to satisfy his burden of showing negligent claim handling.

The Court disagrees and concludes that Travelers has failed to meet its burden based on its superior knowledge of the facts. However, the Court is not prepared to disallow Travelers' entire claim as a result. First, the claim based on the Promissory Note ($2,311,836.82) must be allowed. That amount was acknowledged as owed by S & W pre-petition. At that time, S & W resolved or waived any negligent claim handling defenses it might have had to that claim. With respect to the remaining claims (the 1999–2012 premiums of $5,226,881 and the IBNR [5] of $311,988), the Court concludes that even if the claims were negligently handled the entire claim should not necessarily be disallowed.

In *Deerfield Plastics*, the Court noted that "if any settlement was unreasonably high, 'the insurer would still be entitled to a premium based on what would be a reasonable figure. The insured has had the benefit of having its liability discharged and should pay the correct con-

---

**5.** The final element of the 2012 Claim, IBNR, is an estimated future premium for losses

incurred but not reported. (6/9/15 Tr. at 53.)

tract price.' " *Deerfield Plastics*, 404 Mass. at 488 n. 6, 536 N.E.2d 322 (quoting *Ins. Co. of N. Am. v. Binnings Constr. Co.*, 288 So.2d 359, 361–62 (La.Ct.App.1974)). The Court finds in this case that Travelers is still entitled to a reasonable amount because S & W had the benefit of having its liability discharged.

Except for the 1979 and 1985 Policies, each Retro Agreement included a minimum premium due regardless of S & W's actual loss experience. (Ex. 9 at 3; Ex. 10 at 12; 6/9/15 Tr. at 44–45.) In light of the circumstances presented in this case, the Court holds that the minimum premium is a reasonable amount due to Travelers. *Deerfield Plastics*, 404 Mass. at 488 n. 6, 536 N.E.2d 322. Although some of the Retro Agreements set a specific minimum premium, for most Agreements the minimum premium is formula-driven.[6] The Court does not have the facts necessary to compute the amount due. Even for the policy years with a fixed minimum premium, the Court does not know what amount S & W has already paid to Travelers that would be credited against the minimum premium owed for that policy year. The parties are thus directed to consult and advise the Court if they can agree on the minimum premium still due to Travelers for any of the policy years. In the absence of agreement, the Court will hold a further evidentiary hearing to determine this portion of Travelers' claim.

## IV. CONCLUSION

For the reasons set forth above, the Court will sustain the Objection in part and allow Travelers' claim as follows: (i)

$2,311,836.82 comprising the amount owed on the Promissory Note, and (ii) the aggregate minimum premium owed under the Retro Agreements, without deduction for any amounts Travelers has received under the letters of credit.

An appropriate order follows.

---

6. For example, the 1983 Retro Agreement states that the minimum premium "shall be (1) The Retention Premium times the Tax Multiplier or (2) the sum of: (a) The Workers' Compensation and Employers' Liability Insurance Subject Premium developed under Policies No .... [,] 1% of the General Liabili- ty Insurance Subject Premium ·for all states except Texas and Louisiana developed under Polices No .... [,] (c) 100% of the General Liability Insurance Subject Premium developed in the states of Texas and Louisiana under Policies No ... [,] whichever is greater." (Ex. 8 at 3.)